## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No: _____** |
| | : | |
| | : | |
| -against- | : | **COMPLAINT** |
| | : | |
| | : | |
| **YALE UNIVERSITY, YALE** | : | **JURY TRIAL** |
| **UNIVERSITY BOARD OF TRUSTEES,** | : | |
| **SHERILYN SCULLY in her individual and** | : | |
| **official capacity, ANJANI JAIN in his** | : | |
| **individual and official capacity, WENDY** | : | |
| **TSUNG in her individual and official capacity,** | : | |
| **and K. GEERT ROUWENHORST in his** | : | |
| **individual and official capacity,** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys William B. Bilcheck Jr. Law Offices and Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants Yale University ("Yale" or the "University"), Yale University Board of Trustees (collectively, "Yale Defendants"), and their employees and/or agents, Sherilyn Scully ("Dean Scully"), Anjani Jain ("Dean Jain"), Wendy Tsung ("Dean Tsung"), and K. Geert Rouwenhorst ("Professor Rouwenhorst") against Plaintiff, a student in Yale School of Management's ("SOM") Executive

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.

1

Master of Business Administration Program ("EMBA") program, as a result of an erroneous finding of an honor code violation.

2.      In investigating and adjudicating the false charges against Doe, Yale conducted a disciplinary process that was neither thorough nor impartial, exhibited a bias against Doe, and deprived Doe of his fundamental rights to a fair proceeding, proper notice of the charges, and the opportunity to present his case to an impartial hearing panel.

3.      On the basis of this erroneous, biased decision, Yale first suspended, and upon appellate review, expelled Doe. This expulsion is unduly severe and disproportionate with the alleged honor code violation.

4.      A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants changed the sanction imposed upon Doe, without offering him the opportunity to defend himself to the decision making body, thus limiting his ability to defend himself; (ii) Defendants did not afford Doe the opportunity for live questioning of the student who raised the erroneous claim of an honor code violation to their professor; (iii) Defendants made assessments of credibility and evidentiary weight with respect to various parties without any ascertainable rationale or logic; (iv) Defendants evidenced a gender bias against Doe in the proceedings because they favored the female's wholly uncredited account of events; (v) Defendants failed to afford Doe a prerequisite presumption of innocence; (vi) Defendants allowed a biased member of the decision making body's presence during proceedings; (vii) Defendants removed the sole EMBA representative on the decision making body, and in turn, pressured Doe to proceed with an incomplete panel; and (viii) imposed an unwarranted and disproportionate expulsion in light of all circumstances, all of which demonstrated substantial errors in violation of federal and/or state laws.

5.      As a result of Defendant's unlawful, unjust, and discriminatory conduct, Doe currently cannot continue his education in Yale's EMBA program and lost the financial benefits that accompanied attending the prestigious program. Due to the expulsion, Doe is ostracized from his Yale SOM community of exceptional peers, the campus community, and forever damaged emotionally by the excruciating and unfair process, and terribly unjust results flowing therefrom. Moreover, Doe will suffer immense impact on his future career, education, and potential earnings as a result of this erroneous expulsion.

6.      John Doe therefore brings this action to obtain relief based on causes of action for breach of contract, tortious interference with a contract, violations of Title IX, negligent supervision, negligent infliction of emotional distress, intentional infliction of emotional distress, and estoppel and reliance.

## THE PARTIES

7.      Plaintiff is a natural person, a citizen of the United States, and resident of the State of New York. During the events described herein, Plaintiff was enrolled as a student in Yale SOM's EMBA program.

8.      Upon information and belief, Defendant Yale University is a private, Ivy League, research University, ranked in the top-three universities in the United States, located in the city of New Haven, Connecticut, with an address of Yale University, New Haven, Connecticut, 06520.

9.      Upon information and belief, Defendants Dean Scully, Dean Jain, Dean Tsung, and Professor Rouwenhorst are employed by Yale University.

10.      Upon information and belief, Defendant Board of Trustees is the governing body of Yale University. It is composed of seventeen (17) regular members (ten (10) appointed successor trustees and six (6) elected alumni trustees) with Connecticut's Governor and Lt.

Governor serving as "board members ex officio." Upon information and belief, Defendant Board of Trustees oversees and approves Yale's written policies, including Yale's Code of Conduct.

11.     Plaintiff Doe and Defendants Yale, Yale University's Board of Trustees, Dean Scully, Dean Jain, Dean Tsung, and Professor Rouwenhorst are sometimes hereinafter collectively referred to as the "Parties."

<u>**JURISDICTION AND VENUE**</u>

12.     This Court has diversity, federal question, and supplemental jurisdiction pursuant to 28 U.S.C. § 1332, 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the federal law claim arises under the Constitution and Statues of the United States of America; and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

13.     This Court has personal jurisdiction over Defendant Yale on the grounds that is conducting business within the State of Connecticut.

14.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of Connecticut and in the governing body of Yale University.

15.     Defendants Dean Scully, Dean Jain, Dean Tsung, and Professor Rouwenhorst are natural people, and, upon information and belief, are residents of the State of Connecticut. This Court has personal jurisdiction over Defendants Dean Scully, Dean Jain, Dean Tsung, and Professor Rouwenhorst on the grounds that they conduct business in the State of Connecticut and the interactions with Plaintiff and place which the events occurred are within the State of Connecticut.

16.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Yale is considered to reside in this judicial district and the events or omissions giving rise to this claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

17.     Plaintiff is a graduate of Quinnipiac University, where he received a Bachelor of Science in International Business.

18.     Plaintiff embarked upon a career in management and finance upon receiving his bachelor's degree. Through hard work, determination, intelligence, and perseverance, Plaintiff worked his way to being a manager at a large international financial services institution, where he recruits, selects, and develops high quality financial professionals. Plaintiff has excelled in his current role and ranked in the top five percent (5%) of all managers for 2018.

19.     In order to develop and advance in his career, Plaintiff applied and was accepted into Yale University's prestigious School of Management's EMBA program. He began as an EMBA student in 2018, with an anticipated graduation date of Spring 2020. One hundred and seventy-nine thousand, eight hundred dollars ($179,800) is the approximate total tuition for the EMBA program.

20.     During his time in the Yale EMBA program, Plaintiff excelled academically and entrenched himself into the community. Doe's classmates selected him for and elected him to the Honor Committee. Additionally, Doe created meaningful relationships with professors and fellow classmates.

### *Policies and Procedures*

21.     Upon Plaintiff's enrollment at the University, Yale provided him with copies of its university policies, including the Rights and Responsibilities of Students, which contains the Yale

SOM Honor Code (the "Code") and Procedures of the Honor Committee (the "Procedures"), collectively referred to hereinafter as the "Policies."

22.     The 2018 – 2019 Policies were in effect at the time of the alleged incident.

23.     The Code states in relevant part, "[h]onesty is fundamental to the profession and practice of management. It is therefore the bedrock premise of management education at Yale," and provides jurisdiction to the Honor Committee over all Code violations, including matters of academic dishonesty.

24.     Additionally, the Code provides a standard for academic integrity at Yale.

> "The Yale SOM Community…supports the highest standards of academic integrity. When working on any assignment with a team, students must clarify the expectations for each member of the team…A student will contact the professor for clarification if there is a question about the way in which group work is to be completed. Students will familiarize themselves with the standards or proper citation."

25.     Yale SOM's Honor Committee will consider "instances of academic infractions and other serious violations by Yale SOM students" and is responsible for "collecting facts pertaining to such infractions and violations, making judgments about them, and determining punishment where appropriate."

26.     The Procedures provide that "[s]uspected cases of cheating or other violations of honor code standards should be reports to the chair of the SOM Honor Committee or administrative director of the relevant degree program…assistant dean for the M.B.A. for Executives program."

27.     The Procedures also provide the process that the Honor Committee follows. It is the responsibility of the Honor Committee to "collect the facts relevant to each complaint under consideration and make judgments on whether an infraction or violation has been committed."

28.     As detailed in the Procedures, the process commences when an alleged violation is brought to the attention of the committee. Any relevant materials and written statements are

requested by the chair or chair's designee. Next, the chair decides "whether the offense, if the charge is true, would be of sufficient seriousness to warrant the attention of the committee." If the chair decides that it is "sufficiently serious," the chair informs the student alleged to have committed the behavior in question, of the complaint. Simultaneously, the

> "student will be directed to review the Committee Policies and Procedures to apprise the student of the rights: (a) to appear before the committee, (b) to be accompanied by any member of the University community to act as the student's academic adviser…, (c) to examine any and all written materials being provided to the committee as soon as possible, and ordinarily at least forty-eight [48] hours in advance of the meeting, so that the student may have ample opportunity to refute them."

29.     Per the Policies, the adviser "may help the student in preparing for…and may accompany the student to the meeting" and "[d]uring the meeting…may quietly suggest questions or issues for the student to raise" as detailed above. Additionally, "the adviser **does not participate** directly in the meeting."

30.     The committee chair can choose whether to send the case to a subcommittee or a full committee. A subcommittee "consists of the committee chair…plus one first-year Yale SOM student, and one second-year Yale SOM student, chosen from the full committee. If the accused student is in the…M.B.A. for Executives program, then one of the student members of the subcommittee **must** be from the respective program" (emphasis added). Additionally, the assistant dean serves on the committee, and acts as a non-voting secretary. "If a committee member is excused and a quorum cannot be met, the chair will recommend to the dean a successor for temporary appointment to the committee for participation in the matter." The student whose conduct is in question can object to the committee members within one day of receiving notification from the chair as to whom the members are.

31.     The student that is the subject of the complaint then meets with the committee. At the commencement of the meeting, "the chair will review the Procedures of the Committee and the process to be followed in meetings with the committee."

32.     The subcommittee can select from a variety of actions to take, including, "(a) exoneration, (b) warning (verbal or written), (c) probation, (d) mandatory F in course (for academic infractions), or (e) send the case to the full committee."

33.     After decision from the committee, "the accused student may appeal any decision from the subcommittee to the full committee...within five working days of the subcommittee's decision."

34.     Additionally, the Procedures provide that the dean appoints the full committee and that the full committee "consists of **four faculty members**…**six SOM students** (three from each class in residence, unless modified as under the Process section below), and the assistant dean (who shall act as secretary to the committee and shall be nonvoting)." Furthermore, "[i]f the accused student is in the…M.B.A. for Executives program, then at least one of the student members **must** be from the respective program" (emphasis added).

35.     The full committee may impose all of the same sanctions above as the subcommittee, and, additionally, two more severe sanctions, which are "suspension of one of more terms + mandatory F in course, [and]…expulsion, a permanent separation from Yale SOM. The appeal of the subcommittee decision to the full committee can result in a sanction more severe than the one originally imposed." If a student is expelled, it will appear on his or her transcript, permanently.

36.     Additionally, the Procedures provide that the committee will endeavor to make judgments in a prompt manner. It also details that both the subcommittee and full committee will

8

endeavor to make decisions by a consensus, but, when impossible, will take a majority vote, with

a quorum, consisting of "at least two faculty members, and three students for the full committee

and all members of the subcommittee."

37.     When either the subcommittee or full committee reach a decision, the senior

associate dean is informed at the same time as the student, and the

> "senior associate dean will offer any student against whom an infraction or
> violation is found the opportunity to meet with the senior associate dean, as
> promptly as the dean's schedule may permit, to raise any objections to the
> proceedings on the grounds of procedural irregularity or prejudice. If
> objection is raised, the senior associate dean will investigate the objection
> and may remand the matter to the committee for the correct procedural
> irregularity to re-deliberate after disqualifying the member or members
> found to be prejudiced. A decision of the senior associate dean that the
> proceedings were not irregular or that there is insufficient evidence of
> prejudice will be final."

38.     The Procedures also allow for appeal of the imposed sanction by the accused

student, in writing, from the full committee to the Faculty Review Board ("FRB"), within five

working days. It does not allow for appeal of the findings. The Procedures detail that the FRB

receives the student's written appeal, statements, and supporting documentation, but that the

student is not permitted to attend the meeting, and that their role is "to judge the appropriateness

of the punishment assessed by the committee, assuming correctness of the committee's finding of

a violation. The appeal of the full committee decision to the FRB can result in a sanction more

severe than the one originally imposed." Once the FRB makes a decision, it is final and not subject

to further appeal or review.

***State and Society: Group Dynamics and Think Piece Essays***

39.     As part of completion of the EMBA program, Plaintiff enrolled in State and

Society, MGT 413E, taught by professor David Bach ("Professor Bach") during the Spring 2019

semester. Professor Bach also serves as the Deputy Dean of the EMBA program and Acting Chair of the FRB.

40.     Professor Bach outlined a series of assignments in the syllabus to be completed over the course of the semester, including two group case think piece essays, which accounted for thirty-five percent (35%) of the overall course grade.

41.     A separate document, provided by Professor Bach, laid out the requirements for the case think piece essays. "Each think piece may be up to [one thousand] 1000 words plus exhibits. It is strongly recommended that [students] develop charts, diagrams and tables to support [the] arguments" and needed to be in essay format.

42.     Within Yale's EMBA program, students are assigned to "learning teams" of approximately six students. Doe's learning team included six students total, including Jane Roe[2] and James Coe.[3] Professor Bach assigned Plaintiff Doe to work in a group on the think piece essay assignments with two fellow EMBA students in Doe's learning team, Roe and Coe.

43.     On the first think piece, the group did not perform up to their self-imposed high expectations. After receiving a six (6) out of a possible ten (10) for the first paper, Roe alienated Doe. Additionally, Roe discussed uncomfortable, highly personal topics around Doe. He kindly asked her to refrain from discussion on such topics in light of their status in a professional EMBA program. She used every opportunity to refute comments made by Doe, even to the point of not acknowledging him in the same room. Despite her alienation, Doe continued to treat her cordially and work collaboratively with her on the assignments. Roe also continued her untoward treatment of Plaintiff, called him immature, and that he should take a semester break from the program.

---

[2] Plaintiff refers to Jane Roe pseudonymously.
[3] Plaintiff refers to James Coe pseudonymously.

44.     For the second group think piece, Jane Roe took the lead. Roe submitted the question to Coe, who liked it, and to the teaching assistant for approval. Coe assisted Roe with research and suggested an outline for the paper. Additionally, Coe suggested that they include Plaintiff Doe in the discussion of the outline. Roe explicitly stated to Coe that she did not want to include Doe in the discussion, despite the assignment to work collectively as a group.

45.     Upon receiving the paper initially drafted by Jane Roe, Plaintiff Doe realized that the think piece essay, as is, would result in another undesirable, disappointing mark due to the numerous grammar mistakes. Professor Bach criticized grammar in the group's first think piece essay, which in turn made Doe uniquely aware of the it for the second think piece essay.

46.     Doe desired to have the think piece proofread for spelling and grammar and suggested that they have a fellow Yale SOM student in a different group to Roe. It is common custom that Yale SOM students proofread each other's work, which Yale SOM administrators and professors are very much aware of, and, permit. However, Roe rejected Doe's suggestion because the fellow Yale SOM student, a practicing attorney, was "elbow deep in a trial" and Roe did not want to bother him.

47.     Plaintiff Doe received tutoring help from a friend, Yale graduate Jacob Poe[4], for the graduate school entrance exam, and felt that he would be helpful with editing the paper for grammar. In turn, Doe offered this solution to the group, to which both Roe and Coe agreed. As the project progressed, in a group message with Plaintiff Doe, Jane Roe, and James Coe, Doe expressed that he would finalize the paper the same day with his friend, Poe. He also expressed his willingness to discuss as a group to finalize the paper and that Poe raised concerns about grammar, which would lower their score if uncorrected. Roe replied that they should do what they

---

[4] Plaintiff refers to Jacob Poe pseudonymously.

need to in order to finalize it and to see what the Doe's friend said regarding the final paper. Doe and Coe participated in an online WebEx meeting with Poe. Poe scribed a few of the ideas brought forth by Coe in comment bubbles, specifically Coe's argument that sugar and nicotine are not the same, with specific phraseology, which Coe later used again in a subsequent email. In an attempt to persuade his teammate that the paper needed additional editing, Doe overly stated the scope of his friend's services and that he compensated his friend for his services, to which Roe replied that she was not comfortable with that and would submit her own paper. However, Doe did not compensate his friend Poe for any proofreading services.

48.    After Roe stated she intended to submit her own separate assignment, Doe and Coe needed to decide the best path forward. Coe expressed his desire to submit the assignment.

49.    In an effort to demonstrate total transparency and ethical decision making, Doe contacted Professor Bach prior to turning in the assignment, in order to ensure that he properly credited Poe's assistance, namely, proofreading for grammar and spelling only, in the submission. While Professor Bach was unavailable, Doe reached out to Professor Jack Voe[5] ("Professor Voe"), a former Yale SOM professor and current business school professor at another top ranked university, who advised him on how to properly cite the assistance received. Plaintiff Doe explained to Professor Voe that he had received proofreading assistance on an assignment, one of his team members felt uneasy with the help received, and that he would like assistance on how to be transparent about the assistance he accepted. Professor Voe advised to properly cite and credit the proofreader, which Doe indeed placed on the think piece.

---

[5] Plaintiff refers to Jack Voe pseudonymously.

50.     Doe also consulted his fellow EMBA class Honor Committee representative and Yale faculty member, Jason Moe[6], in his capacity and in accordance with his duties as Honor Committee representative. After careful description of the situation to Moe, Moe advised to submit the paper because he did not recognize any alleged issue or wrongdoing.

51.     After consulting with various individuals, Doe and Coe submitted their think piece essay in May 2019. On the submitted assignment, Plaintiff Doe cited and credited the proofreader, based upon the advice he received from Moe and Professor Voe.

52.     Roe submitted her own think piece, separate from Doe and Coe, prior to its scheduled due date in May 2019.

53.     In order to explain why Roe submitted a think piece separate from her assigned group, Roe brought her concerns about the proofreader on Doe and Coe's think piece to the attention of the teaching assistant and Professor Bach for the class. The teaching assistant opined that the paper submitted by Doe and Coe had a bit more to it than the paper submitted by Roe, and that some things appeared reworded or rearranged, but that the substantial similarities between the think piece submitted by Doe and Coe, and the separate think piece submitted by Roe were clear.

54.     After submission of the think piece, prior to grading, and completely unaware of Roe's wrongful allegations against him, Doe spoke with Professor Bach directly regarding the think piece. Again, in an effort to demonstrate complete transparency and ethical decision making, Doe explained to Professor Bach that he received assistance with proofreading the paper for only spelling and grammar and spoke with two knowledgeable individuals, Professor Voe and Honor Committee Member Moe, regarding how to properly cite the proofreader in an ethical manner. Professor Bach questioned why Doe did not seek assistance from an internal Yale resource,

---

[6] Plaintiff refers to Jason Moe pseudonymously.

specifically the Graduate Writing Lab, to which Doe replied he did not know such a Yale resource existed. However, as per the Poorvu Center for Teaching and Learning's Website, the Graduate Writing Lab does not provide proofreading services. *Graduate Writing Laboratory – Frequently Asked Questions*, YALE UNIVERSITY POORVU CENTER FOR TEACHING AND LEARNING, https://poorvucenter.yale.edu/writing/graduate/individual-writing-consultations/frequently-asked-questions (last visited October 18, 2019). Additionally, Doe offered to receive no credit for the assignment and receive a zero (0) as a grade.

55.     Doe and Coe later received a seven (7) out of a possible ten (10) points for a grade on their think piece essay.

### *Honor Committee Review and Decision*

56.     Professor Bach submitted the case and materials for Honor Committee review on or around July 3, 2019, approximately two months after the submission of the think piece.

57.     Plaintiff Doe received an email on July 11, 2019 from the Assistant Dean of the EMBA program, Wendy Tsung, that asked Doe to speak on the phone with both her and the Assistant Dean for Academic Affairs and Student Life, Dean Scully, related to an academic issue.

58.     On the phone call, which occurred on or around July 15, 2019, Doe spoke with Deans Tsung and Scully. Dean Scully made accusatory comments towards Doe, indicating that she already decided upon an erroneous conclusion regarding both Doe and Doe's alleged honor code situation. She aggressively questioned why Doe spoke with Professor Bach regarding the paper. Doe expressed that he did so in an effort to demonstrate total transparency and ethical decision making. Furthermore, Doe detailed that he spoke with Moe prior to submission of the assignment and Dean Scully took no issue with it.

59.     Additionally, Dean Scully informed Doe that the alleged violation would move forward to a full committee hearing and that Doe, in his capacity as honor committee member, would be recused from participation, and Moe, the other EMBA student honor committee member, would participate.

60.     The Honor Committee that reviewed Doe's case included:

- Professor Rouwenhorst, Robert B. and Candice J. Haas Professor of Corporate Finance and Deputy Director of the International Center for Finance, as Chairman of the Honor Committee;

- Shyam Sunder ("Professor Sunder"), James L. Frank Professor of Accounting, Economics, and Finance;

- James Choi ("Professor Choi") Professor of Finance;

- Three Yale SOM non-EMBA students;

- Yale SOM EMBA student Jason Moe; and

- Ex officio members Deans Scully and Tsung.

61.     Plaintiff Doe submitted a series of materials to the Honor Committee reviewing the case. His statement detailed that the help received did not amount to more than grammar and proofreading edits. He also submitted the redline document of the assignment that he received from Poe, which plainly portrayed that every edit made by his friend was for proofreading and grammar. Additionally, he submitted the email he sent to Professor Bach, prior to submission of the assignment, asking to talk to him, and two conversations with Roe and Coe regarding the assignment.

62.      Professor Voe submitted a letter to the honor committee, stating that he had Doe as a student, and the two remained in contact after conclusion of the course. Additionally, he

detailed that Doe explained to him that one of Doe's team members felt uneasy about the help received on the paper and Doe thus sought advice on how to transparently and properly disclose the assistance he received for the assignment. Doe's friend Poe also delivered a letter to the Honor Committee, dated August 29, 2019, that detailed his involvement. Poe provided that he made only general spelling and grammar edits to the paper and did not receive any compensation for his work.

63.     Throughout the entire honor committee review process, Doe was honest and transparent regarding the situation in order to demonstrate that he did not have anything to hide concerning the help received.

64.     By way of comparison, Coe, the team member who worked on the paper with Doe and Roe, submitted an email to the honor committee that Coe received from Roe, where Roe stated that she also used her own proofreader, a "tech editor" with whom she worked. However, Yale failed to take any action against Roe upon receipt of this information. Coe also brought this directly to the attention of Dean Scully, who similarly declined to take any action.

65.     On or around September 6, 2019, the Honor Committee met to review the case. While awaiting appearance before the committee, Doe heard Moe and Dean Tsung communicating loudly in the hallway.

66.     Directly prior to entering the room to appear before the Honor Committee, Dean Scully informed Doe and Coe that due to a procedural issue, Moe would not be serving on the Honor Committee reviewing their alleged infraction and inquired whether they would proceed without an EMBA representative. Coe immediately responded yes. Dean Scully turned her attention to Doe and informed him that if he did not proceed that very day, it would be another five weeks until another Honor Committee meeting could potentially occur. Under the forceful

eyes of Dean Scully, with her words ringing in his head, Doe felt immense, immediate pressure to move forward, or else face a committee biased against him for delaying the process.

67.     The Honor Committee members attacked Doe with questions. For instance, an Honor Committee member questioned Doe on a specific document, which Doe requested clarification on which document it was, and whether he could see it. This Honor Committee member hostilely replied that Doe was not entitled to see the document at the subject of the questioning.

68.     The Honor Committee also questioned Doe regarding the assistance given by Poe. Doe stated that Poe only assisted with proofreading, namely spelling and grammar. He also detailed the WebEx meeting between Coe, Poe, and himself regarding the think piece, where Coe asserted that sugar and nicotine are not the same thing, with specific word usage, which Poe scribed into a comment bubble. Doe also highlighted a subsequent email where Coe used similar phraseology, which is indicative of his original work. Again, in an effort to demonstrate full transparency, Doe took out his laptop and forwarded these documents to the Honor Committee during the meeting. The Honor Committee instructed him to send it to Dean Scully, which he did.

69.     Doe also brought an adviser, former Navy commander Jenna Loe[7], with him to the Honor Committee hearing, as permitted by the Policies. Per the Policies, the adviser "may help the student in preparing for…and may accompany the student to the meeting" and "[d]uring the meeting…may quietly suggest questions or issues for the student to raise" as detailed above. Additionally, and most importantly, "the adviser ***does not participate directly*** in the meeting," per the Policies (emphasis added).

---

[7] Plaintiff refers to Jenna Loe pseudonymously.

70.     Honor Committee Member Professor Sunder asked Doe whether anyone helped him prepare his statement. He replied that his adviser, Loe, present in the room, assisted him, as permitted by the Policies. Professor Sunder then asked permission of the Chairman of the Honor Committee, Professor Rouwenhorst, to "cross-examine" Loe at that very moment. Professor Rouwenhorst erroneously permitted and encouraged Professor Sunder to cross-examine Loe, Doe's adviser. This wrongful cross-examination, and clear deviation from the Policies, continued for approximately five to ten minutes. This clearly demonstrates the Committee's bias and unfairness towards Doe.

71.     After the Honor Committee hearing, Doe returned to class, and continued about his day as best he could.

72.     While in class, Doe noticed that Roe received a phone call, stepped out to take it, and returned shortly after with a smile upon her face.

73.     Ten minutes after Roe's phone call, approximately around five o'clock, Doe received a phone call from Dean Scully, that requested Doe's presence in a conference room. Doe met Defendants Professor Rouwenhorst, Dean Scully, and Dean Tsung in the conference room where they informed him that the Honor Committee erroneously found that he "engaged in improper collaboration" regarding the think piece assignment, and consequently suspended him for one calendar year.

74.     During the conference room meeting with Defendants Dean Scully, Dean Tsung, and Professor Rouwenhorst, Doe asked for the basis of the decision. Professor Rouwenhorst replied that they credited a WhatsApp message interaction as the basis for their decision (in turn, disregarding the vast majority of the evidence Doe submitted, as well as his live statement in the

Honor Committee meeting). Additionally, Doe inquired as to whether he should appeal. Professor Rouwenhorst stated that most students appeal.

75.     Coe received also received a suspension from Yale SOM and would be required to pay tuition while serving the suspension.

### *Post-Honor Committee Sanction: Occurrences and FRB Appeal*

76.     The day after the Honor Committee hearing, September 7, 2019, Moe, who served, and was subsequently removed, as the only EMBA honor committee representative, wrote a letter to express his dismay over the decision regarding Plaintiff Doe's case. In Moe's letter, he detailed that in the Honor Committee meeting, after discussing his background knowledge of the case, as well as his familiarity with Plaintiff Doe and James Coe, Dean Scully told him that she felt he acted inappropriately. He described in this letter that Dean Scully asked him to leave the room so the Honor Committee could conduct a vote on whether or not to allow Moe to participate in further proceedings regarding the case.

77.     The Honor Committee erroneously voted to remove Moe from any further proceedings of discussion, thus leaving the Honor Committee without it's required EMBA student representative, as required by the Policy.

78.     Moe continued in his letter to express that the Honor Committee did not value his opinions, or the opinions of the EMBA class. Additionally, Moe believed the Honor Committee removed him because his opinion differed than the opinions of the others. He further noted that after the meeting, he met with Professor Bach about his concerns. Professor Bach verified that Moe acted appropriately.

79.     Yale placed an undue amount of pressure upon Doe to move the Honor Committee review along and he hastily agreed to move forward without EMBA representation due to this unwarranted pressure because of his desire to continue in the program, as detailed above.

80.     Plaintiff Doe subsequently expressed his concerns regarding the committee to Dean Anjani Jain, Deputy Dean for Academic Programs and Professor in the Practice of Management, and Chairman of the FRB, and Dean Scully, in a phone call on September 11, 2019 and an email, dated September 13, 2019, prior to the submission of his appeal. Doe highlighted that the Honor Committee that reviewed his case only consisted of three faculty members and three students. Additionally, he expressed to Dean Jain that he felt as though the Honor Committee did not fairly assess and evaluate his statements during the meeting because it appeared that the Honor Committee decided upon a wrongful finding of responsibility, as well as the disproportionate sanction, prior to the hearing. He also detailed that Dean Scully improperly removed the Policy mandated EMBA student from the Honor Committee, which unfairly left his section unrepresented during the committee review of his own case. Doe also explained to Dean Jain that the entire process impacted him immensely and shared that he suffered from panic attacks caused by the undue stress this process placed upon him and that sought the help of a therapist. Additionally, Doe asked for clarification regarding his options from that point forward, specifically, whether he should appeal to the FRB.

81.     In the same email, Plaintiff Doe voiced his unease that Dean Scully, ex officio member of the Honor Committee that reviewed his case, had a close personal relationship Jane Roe, the student that Doe worked on the think piece with and who brought forth the allegations against Doe to Professor Bach's attention. This close relationship was evidenced by the fact that Roe has been an overnight guest in Dean Scully's home and that Roe's fiancé shared shabbat

dinners with Dean Scully. Doe stated that at no point in the process did Roe, Dean Scully, or Yale disclose this relationship to him, and, that had he been aware, he would have asked for her removal from the committee. Alternatively, he questioned why Dean Scully did not recuse herself from the committee. Doe disclosed this information immediately upon awareness of it.

82.    Dean Jain refuted several of Doe's points. First, Dean Jain detailed that the Honor Committee unanimously voted to remove the EMBA student representative from the committee, that it was "entirely appropriate," and, that Doe declined the option to replace this member, completely ignoring the immense pressure the University placed upon Doe to continue forward with the Honor Committee hearing. Additionally, Dean Jain erroneously refuted the existence of Roe and Dean Scully's personal relationship. Dean Jain provided that Roe was the fiancé of a family friend, that Dean Scully had no prior relationship with Roe, and that the only reason Roe may have stayed in Dean Scully's home, which allegedly could not be confirmed, would have been with the fiancé's family. Lastly, Dean Jain provided that Doe's next step was to appeal to the FRB.

83.    Doe replied again, refuting Dean Jain's erroneous statement regarding the close personal relationship of Roe and Dean Scully and requested Dean Scully's removal from the FRB's review of his appeal. Dean Jain, despite insistence of Dean Scully's impartiality and continuous erroneous denial of the personal relationship with Roe, honored the request, and Dean Tsung subsequently served alone as ex officio member.

84.    Separately, Doe contacted Jason A. Killheffer ("Killheffer"), Assistant Provost, Senior Deputy Title IX Coordinator on September 12, 2019. He recounted his situation, as detailed above.

85.     Killheffer asked Doe to forward Moe's email. He additionally promised to follow up and contact Doe with next steps. However, Killheffer failed to take any additional action or subsequently contact Doe.

86.     Doe appealed the sanction to the FRB, as permitted by the Policies. He submitted materials and a statement that detailed all the steps taken in order to ensure transparency and ethical decision making and expressed his desire to continue forward in the EMBA program. Doe did not appear live in a hearing before the FRB because Yale's Policies wrongly do not allow for a live appeal hearing before the FRB.

87.     Dean Jain requested that Plaintiff Doe telephone him on September 17, 2019, to inform Doe of the decision of the FRB.

88.     On this call, Dean Jain notified Doe that the FRB wrongly changed Doe's suspension of one year to a permanent expulsion, a complete separation, from Yale SOM's EMBA program, a sanction disproportionate with the alleged wrongdoing.

89.     Yale imposed an unnecessarily severe sanction upon Doe, particularly in light of other sanctions dispensed. For instance, three of Doe's Yale SOM classmates received the same one-year suspension for an infraction of a more severe nature. These three classmates shared an answer key to a take home exam while on a train ride, thus constituting cheating on the exam. A fourth classmate witnessed the behavior and subsequently reported it. At first, the three classmates that shared the answer key denied the allegations. However, eventually, the three submitted a statement to the Honor Committee, admitted guilt, and in turn, received a one-year suspension.

90.     Coe also appealed, and, conversely, the FRB reduced his suspension to six months, without associated costs.

***Plaintiff Doe's Injuries***

91.     Plaintiff Doe's official Yale transcript now bears a notation of a permanent expulsion due to this sanction that is disproportionate with the conduct Doe exhibited.

92.     Yale did not afford Plaintiff Doe any opportunity to appeal the FRB's imposition of the erroneous sanction of expulsion.

93.     As a result of Defendant's unlawful actions, Doe has suffered and will continue to suffer immense losses. It will be enormously difficult for Doe to transfer his credits to any other EMBA program to obtain any EMBA degree, let alone from an institution as prestigious as Yale. Due to the black mark on his transcript, he will forever have to explain the reasons for his expulsion.

94.     Plaintiff's career will forever be impacted. Plaintiff Doe currently is employed as a manager at a large international financial services institution, where he recruits, selects, and develops high quality financial professionals, as previously discussed. He has excelled in his current role and ranked in the top five percent (5%) of all managers for 2018. Additionally, Doe has several professional licensures that he worked tirelessly to obtain. This expulsion could impact whether he maintains those licensures.

95.     Doe has also experienced emotional, psychological, and physical distress as a result of the investigation and his expulsion.

96.     The marking of Plaintiff's academic transcript with an expulsion for an honor code violation will permanently deny Plaintiff's educational and career opportunities, as he will forever be forced to explain that a biased decision-making body erroneously determined that he violated the Honor Code. Plaintiff will be unable to pursue a career in professions which require licensure or background checks, which will permanently alter the trajectory of Doe's life.

## AS AND FOR A FIRST CAUSE OF ACTION

23

**Breach of Contract**
**(Yale Defendants)**

97.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

98.     Doe applied to and enrolled in the University and paid the associated fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the Policy. Through the documents it publishes and provides to students, the Yale Defendants make express contractual commitments to students involved in an honor code violation process.

99.     An express contract, or, alternatively, a contract implied in law or in fact was formed between Doe and the University.

100.    The contract contained an implied covenant of good faith and fair dealing. Defendants implicitly guaranteed that any proceedings would be conducted with basic fairness.

101.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff and the covenant of good faith and fair dealing contained therein.

102.    Defendants committed several breaches of their agreements with Plaintiff Doe during the Honor Code violation review process. A non-exhaustive list of Defendants' breaches includes the following:

**Failure to Notify Plaintiff of Charges Against Him and Standard of Review**

103.    Defendants failed to properly notify Plaintiff of the charges against him and rights under Yale's policies because Defendants asked Doe to call Deans Scully and Tsung cryptically

regarding an academic issue, without an adviser, and without full knowledge of the complaint alleged against him.

104.    Additionally, Yale's Policies do not set forth the standard of review employed by the Honor Committee when making a decision regarding a code of conduct violation. Without knowledge of the standard of review upon which his credibility and materials would be assessed, Doe could not adequately prepare or know what would be expected of him to produce for the Honor Committee meeting.

### Failure to Assemble a Full Committee

105.    Defendants failed to afford Doe a full panel to review his case.

106.    The Procedures provide that the dean appoints the full committee and that the full committee "consists of four faculty members…six SOM students (three from each class in residence, unless modified as under the Process section below), and the assistant dean (who shall act as secretary to the committee and shall be nonvoting)."

107.    The Honor Committee that reviewed Doe's case included only three professors and three students. This Committee fell short of the prescribed number of members by one faculty member and three students. Yale failed to afford the proper opportunity to have Doe's case heard, reviewed, and decided by a properly assembled panel, in compliance with the Policies.

### Failure to Afford EMBA Student Representation on the Honor Committee and Undue Pressure Imposed upon Doe to Move Forward with the Meeting

108.    Defendants failed to afford Doe EMBA student representation on the Honor Committee that reviewed his case.

109.    The Policies, in relevant portion, state, "[i]f the accused student is in the…M.B.A. for Executives program, then at least one of the student members **must** be from the respective program" (emphasis added).

25

110.    Dean Scully erroneously called for and lead the Honor Committee in a vote to remove Moe, the sole EMBA student representative, from the Honor Committee reviewing Doe's case. The removal of Doe's peer from the panel caused Doe's section to be unrepresented and did not afford Doe the opportunity to have his conduct reviewed by a peer.

111.    Moe himself reflected the injustice and circumstances surrounding his removal in a letter he scribed for review upon appeal.

112.    The circumstances in which Yale pressed forward with the Honor Committee meeting are cause for alarm. Dean Tsung pressured Doe to move forward, or else face a committee biased against him for delaying the process because she approached Doe regarding Moe's removal directly prior to entering the room to appear before the Honor Committee. Additionally, Coe immediately replied yes, to which, Doe felt even more pressure under the forceful eyes of Dean Tsung.

**<u>Wrongful Cross-Examination of Doe's Adviser</u>**

113.    Defendants failed to properly follow their policies in the Honor Committee Review meeting because they cross-examined Doe's adviser, Jenna Loe.

114.    Per the Policies, the adviser "may help the student in preparing for…and may accompany the student to the meeting" and "[d]uring the meeting…may quietly suggest questions or issues for the student to raise" as detailed above. Additionally, and most importantly, "the adviser ***does not participate directly*** in the meeting," per the Policies (emphasis added).

115.    Professor Rouwenhorst, chair of the Honor Committee improperly permitted Professor Sunder to cross-examine Loe during the Honor Committee meeting. The Policies, re-printed above, do not allow for Loe for participate in the meeting directly. Therefore, cross-examination, or questioning in any manner for that matter, is impermissible under the Policies.

26

116.     Additionally, Professor Sunder vehemently questioned Loe on the assistance she provided for Doe to prepare for the meeting. Per the Policies, Doe is permitted to receive assistance preparing for the meeting. Professor Sunder's wrongful questioning, erroneously permitted by Professor Rouwenhorst, painted Doe's assistance in an unfavorable light, which likely contributed to their erroneous imposition of a sanction against him.

### Disregarded Evidence that Supported Doe's Credibility and Highlighted his Adherence the Policies

117.     The Honor Committee blatantly ignored evidence that supported Doe's credibility and highlighted his adherence to the Policies. The Code states in relevant part, "[h]onesty is fundamental to the profession and practice of management. It is therefore the bedrock premise of management education at Yale," and provides jurisdiction to the Honor Committee over all Code violations, including matters of academic dishonesty. Additionally, the Code provides a standard for academic integrity at Yale.

> "The Yale SOM Community…supports the highest standards of academic integrity. When working on any assignment with a team, students must clarify the expectations for each member of the team…*A student will contact the professor for clarification if there is a question about the way in which group work is to be completed.* Students will familiarize themselves with the standards or proper citation."

(emphasis added).

118.     Additionally, it is the responsibility of the Honor Committee to "collect the facts relevant to each complaint under consideration and make judgments on whether an infraction or violation has been committed."

119.     The Honor Committee failed to consider that Doe contacted Professor Bach, the professor for the course, to receive his guidance, as the Code, reprinted above, prescribes. Doe contacted Professor Bach on his own accord to show total transparency after submission of the

27

think piece essay to again discuss the proper citation form and raise awareness to Professor Bach, which, yet again, the Honor Committee failed to consider. Additionally, Doe contacted a former professor while Professor Bach remained unresponsive, to ensure that he properly cited the assistance received.

120.    The Honor Committee also failed to take into account the materials that Doe submitted which evidence the help received, specifically a document that details each and every change made by the proofreader. Other documents that the Honor Committee failed to consider include emails, letters, and Doe's own statement, detailed above. Additionally, the Honor Committee failed to consider the actions taken by Doe to demonstrate total transparency throughout the process, including the guidance from several professors and an Honor Committee representative, full disclosure, and proper citation of the assistance received on the think piece essay in question.

### **Failure to Remove a Biased Honor Committee Member**

121.    Dean Scully failed to recuse herself from the Honor Committee review and meeting due to her personal relationship with Jane Roe and Roe's fiancé.

122.    The Policies allow for removal of any Honor Committee members, upon request by the student whose alleged conduct is in question.

123.    While Defendants removed Dean Scully from the FRB proceeding, the damage she inflicted already tainted the proceedings because she called for a vote to remove, and subsequently removed Moe from the Honor Committee.

124.    Doe raised this concern immediately upon when he received the knowledge of Dean Scully's personal relationship with Roe. However, as highlighted above, Dean Scully had already participated in the Honor Committee meeting.

28

### Lack of Rationale for Expulsion

125.    The FRB did not provide a rationale for the decision and sanction of expulsion in violation of Yale's policy.

126.    Yale's Policies do not set forth the standard of review employed by the Honor Committee when making a decision regarding a code of conduct violation. Without knowledge of the standard of review, it is impossible for Plaintiff Doe to understand how the FRB concluded to expel him from Yale.

127.    In the interest of fair process, Defendants should have provided Doe with an explanation beyond "violat[on] [of] the school's Honor Code."

128.    Additionally, Doe's expulsion is exceptionally excessive because Coe, his think piece team member, received a one semester suspension, for the same alleged misconduct.

129.    Defendants failed to impose a proportional sanction to the alleged misconduct.

130.    Defendant also imposed an unjustly severe penalty upon John Doe, wholly disproportionate to the conduct in question. For instance, the Honor Committee imposed a one-year suspension to other Yale SOM students that cheated on an exam. Yale SOM's Honor Committee did not expel these students even though cheating is a more severe infraction than Doe's alleged infraction that consisted of properly credited proofreading.

131.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct as alleged above, John Doe sustained substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; loss of capacity for the enjoyment of life; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; loss of tuition fees; and loss of future employment prospects.

132.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION

### Tortious Interference with a Contract
### (Defendants Scully, Rouwenhorst, Tsung, and Jain)

133.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

134.    At all times relevant to this complaint, Plaintiff John Doe had a contractual relationship with Yale.

135.    At all times relevant to this Complaint, Defendants Dean Scully, Dean Tsung, Dean Jain and Professor Rouwenhorst knew of Doe's contractual relationship with Yale.

136.    At all times relevant to this Complaint, Defendants Deans Scully and Tsung, in their roles on the Honor Committee, and Defendant Rouwenhorst, in his role as Honor Committee chair, were responsible for ensuring that Doe received fair and equitable treatment, and that all the Honor Committee, followed the Yale Policies properly.

137.    Defendant Scully, by her actions and omissions described, specifically, the spearheading of Moe's dismissal from the Honor Committee and her failure to recuse herself due to her personal relationship with the student who brought forth the alleged action, intentionally and maliciously interfered or attempted to interfere with Doe's relationship with Yale.

138.    Defendant Tsung, by her actions and omissions described, specifically the pressure she imposed upon Doe to proceed with the Honor Committee meeting, despite improper removal of EMBA student representation on the aforementioned committee, intentionally and maliciously interfered or attempted to interfere with Doe's relationship with Yale.

139.    Defendant Rouwenhorst, by his actions and omissions described above, specifically his improper permittance of Professor Sunder's "cross-examination" of Doe's adviser, Jenna Loe, and disregard for Yale' Policies, intentionally and maliciously interfered or attempted to interfere with Doe's relationship with Yale.

140.    Defendant Jain, by his actions and omissions describe above, specifically the failure to provide a reason for Doe's expulsion, intentionally and maliciously interfered or attempted to interfere with Doe's relationship with Yale.

141.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct as alleged above, John Doe sustained substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; loss of capacity for the enjoyment of life; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; loss of tuition fees; and loss of future employment prospects.

142.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION

**Violation of Title IX of the Educational
Amendments of 1972: Selective Enforcement
(Yale Defendants)**

143.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

144.    Plaintiff Doe sustained discrimination because of his sex that was so severe, pervasive, and/or objectively offensive, that it deprived him of access to educational opportunities.

145.    Defendants treated Jane Roe more favorably than Plaintiff Doe at every turn. First, Defendants decided to move forward with the Honor Committee review due to motivation of bias

with respect to sex. Next, Defendants made wrongful assessments of credibility regarding the claims that Roe brought forth, despite a variety of evidence presented by Doe, including his actions, documents, and statements. Additionally, Defendants, in a wrongful and desperate effort to find that Doe violated an academic policy, committed several violations of their own Policies in the Honor Committee meeting, which evidence their bias against Doe, which are highlighted in detail above. Lastly, and most importantly, Defendants blatantly disregarded and ignored evidence presented that Roe herself received assistance editing the paper from an outsource. Defendants chose to bring forth the case of the alleged incident concerning Doe's proofreading because of their bias against Doe due to his gender.

146.    Conversely, Defendants failed to take any action, despite their awareness, regarding Roe's allegedly more severe honor code violation, particularly in light of the fact that she did not disclose the assistance she received from an outside source with her think piece essay.

147.    Plaintiff, based solely on his gender, suffered selective enforcement of the disciplinary process which has limited his ability to participate in and benefit from Yale's educational program. Yale's unlawful discrimination violated Title IX and caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; loss of capacity for the enjoyment of life; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; loss of tuition fees; and loss of future employment prospects.

148.    As a result of the foregoing, Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION

### Negligent Supervision
**(Yale Defendants)**

149.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

150.    The Defendants' Honor Committee review and hearing, and all related conduct occurred under Defendants' authority and with Defendants' specific knowledge. The FRB's wrongful decision to expel Plaintiff Doe and all related conduct also occurred under Defendants' authority, with Defendants' specific knowledge.

151.    Defendants' failed to adequately supervise the Honor Committee and the FRB sufficiently to provide Plaintiff with a fair and impartial adjudication in accordance with Defendants' policies and applicable law, as well as how to properly assess credibility, while considering all evidence and statements.

152.    Based upon the foregoing, as a direct and proximate result of Defendants' conduct as alleged above, John Doe sustained substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; loss of capacity for the enjoyment of life; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; loss of tuition fees; and loss of future employment prospects.

153.    As a result of the foregoing, Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR A FIFTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress
**(All Defendants)**

154.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

155.   The Defendants' conduct, as described above, caused Plaintiff mental anguish and emotional distress.

156.   Plaintiff's mental anguish and emotional distress were foreseeable.

157.   Plaintiff's mental anguish and emotional distress were severe enough that they might result in bodily harm or illness. Due to the undue stress placed upon Plaintiff during this process, Doe has been unable to sleep and suffers from severe anxiety, which impacts his daily life. He requires counselling and medication to assist him.

158.   The defendants' conduct in fact caused Plaintiff's severe and substantial mental anguish and emotional distress. As a result of Defendants' conduct, Plaintiff suffers from severe anxiety and sleep deprivation.

159.   As a result of the foregoing, Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR AN SIXTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress
**(All Defendants)**

160.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

161.   The Defendants knew or should have known that emotional distress was the likely result of their conduct, described above.

162.   The Defendants exercised extreme and outrageous conduct from the onset of the Honor Committee referral throughout the entire process, by selecting to refer the case to the Honor Committee, committing numerous violations of the Policies, and imposing a disproportionate sanction of expulsion to the alleged conduct in violation of the Policies, particularly in light of

Doe's team member's sanction of a one semester suspension for the same alleged violation and prior Honor Committee sanctions imposed for more severe infractions.

163.    The Defendants' conduct in fact caused Plaintiff severe and substantial mental anguish and emotional distress. As a result of Defendants' conduct, Plaintiff suffers from severe anxiety and sleep deprivation.

164.    As a result of the foregoing, Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR AN SEVENTH CAUSE OF ACTION

### Estoppel and Reliance
### (Yale Defendants)

165.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

166.    Yale's various Policies constitute representations and promises that Yale should have reasonably expected to induce action or forbearance by Plaintiff.

167.    Yale expected or should have expected Plaintiff to accept its offer of admission, incur tuition fees and expenses, and choose not to attend other graduate programs based on its express and implied promises that Yale would not tolerate, and Plaintiff would not suffer, discrimination by fellow students of faculty members, and would not deny Plaintiff his procedural rights should he be accused of a violation of any of Yale's policies.

168.    Plaintiff relied to his detriment on these express and implied promises and representations made by Yale, by choosing to enroll in Yale's EMBA program.

169.    Based on the foregoing, Yale is liable to Plaintiff based on Estoppel.

170.    As a direct and proximate result of the above conduct, Plaintiff sustained damage, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

171.    As a result of the foregoing, Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)      on the first cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, damages to reputation, and loss of future career prospects;

(ii)     on the second cause of action for tortious interference with a contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iii)    on the third cause of action for violation of Title IX of the Education Amendments of 1972, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iv)     on the fourth cause of action for negligent supervision, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future

economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)     on the fifth cause of action for negligent infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vi)    on the sixth cause of action for intentional infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vii)   on the seventh cause of action for estoppel and reliance, judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational and career opportunities, and loss of future career prospects; and

(viii)  a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the sanction of expulsion by Yale should be reversed; (ii) Plaintiff immediately reinstated as a student in good standing and permitted to begin classes immediately upon commencement of the next semester; (iii) Plaintiff's reputation should be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; (vi) any record of the proceeding regarding the conduct of Plaintiff be permanently destroyed; and (vii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe demands a trial by jury of all triable issues in the present matter.

Dated: New York, NY                          Respectfully submitted,
      October 21, 2019                    *Attorneys for the Plaintiff*

**NESENOFF & MILTENBERG LLP**        **WILLIAM B. BILCHECK JR. LAW OFFICES**

By: /s/ *Andrew T. Miltenberg*               By: /s/ *William B. Bilcheck Jr.*
Andrew T. Miltenberg, Esq.                   William B. Bilcheck Jr., Esq.
*(pro hac vice admission pending)*           12 Brookside Road
Stuart Bernstein, Esq.                       Madison, Connecticut 06433
*(pro hac vice admission pending)*           (203) 245-6252
363 Seventh Avenue, Fifth Floor              madctatty@aol.com
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com

Regina M. Federico, Esq.
*(pro hac vice admission pending)*
101 Federal Street, Nineteenth Floor
Boston, Massachusetts 02110
(617) 209-2188
rfederico@nmllplaw.com